In The 8th Circuit Court of Appeals (1)

**RECEIVED**

AUG 30 2013

**U.S. COURT OF APPEALS
EIGHTH CIRCUIT**

**FILED**

SEP - 9 2013

MICHAEL GANS
CLERK OF COURT

— Application for ch.153; Habeas Corpus —

(Pro Se) Capitel Case

United States
v.     Plaintiff

Jeffery W. Paul
        Defendant          Case No. _____ 6:96 CR. 60022-001

                                              JLH / BAB

13-2987

— Motion to enter upon record, Application for writ of Habeas Corpus; §2242; (&) issuance; §2243; pursuant to due process, §2255; to vacate conviction (&) sentence due to actual innocence — §2241;(E)(b)(2)(3) —

Comes now the petitioner; does submit this pro se motion for due process; in extreme duress; for relief of a fundamental miscarriage of justice.

(1.) Petitioner was convicted of Homicide (&) Robbery on June 23, 1996; Hot Springs ARKANSAS, in the Western District of Arkansas; (&) sentenced to death.

(2.) On approximately July 14, 2013; petitioner received a copy of an affidavit which exonerates me of guilt for that crime (&) is consistant with previous statements from that individual; Mr. Trinity Ingle; which petitioner requests entered into the record, (via) §2246; (&) §2247; that affidavit was procedurally barred during trial because his counsel was appealing his conviction.

(3.) On August 27, 2013; watching the educational channel; I noticed a Math program was on (&) although I get different answers; I am again, asking for the court to consider minor age as a factor; because that is considered cruel

(3) Continued... (A) unusual punishment; to expose person under the age of 18 years; to the Death penalty.

(4) Pursuant to §2248; conclusiveness; petitioner requests the Court remand with direction to accept cause as true; (ie); a fundamental miscarriage of Justice; false conviction; (B) illegal penalty; (C) Documents Marked; Affidavit of Trinity Edward Ingle; (D) sheet marked; Sentence Monitering Computation Data; are genuine (&) Certified (E) there is no ambiguity about the Minor Capacity in statutory law; 17 years of Age (=) 6,205(A)(1 day) or (L) Greater than; (F) 18 years of Age (=) 6,570(A)(1 day) or (L) Greater than; Ref; ch. 51; T.18; §1111; FCC &R; (C)(2)(ie); 18 years of age; (G) that is subject to Collateral attack.

(5) Petitioner requests; Conviction (&) Sentence be vacated; due to actual innocense; (B) illegality of offense class; pursuant to legal relief; §2255; (a); arrest (&) conviction was violation of 1st; 4th; 5th; 6th; 7th; 8th; 9th; 10th; 11th; (B) 13th; (C) 14th Amendments.

(6) Petitioner does not know Dates of impediment removal; (F)(2) but; (3); that date is July 14; (Proxy) 2015; due to actual innocense; fundamental Miscarriage of Justice; (B) Aug. 27, 2015; Despite a learning disability;

(7) Petitioner requests a review for (h) permission to file successive motions; due to inability to adequately present the first plead; (via) §2244; because although there was (2) transcripts/Affidavits exonerating petitioner of guilt; since 4/96; both were jargon (or) ambiguous to Court; supposedly; but the declaration of Trinity Edward Ingle; is Concise

<u>In The 8th circuit court of Appeals</u>                                          (3.)

(7.) continued; - (5) exonerates petitioner of any inculpation
for that crime (6) incidental crime, wholly excluding
me as any principle party.
(8.) Petitioner claims; Roper v. Simmons (2005) USC, excludes
81111, for persons by way of incompotence, as well, & that
that could apply retroactively because the case was
adjudged in June, 97.


Respectfully Submitted

& <u>Jeffery Paul W</u>
Po. Box 33, Terre Haute, IN.
47808

Certificate of Service ; I, Jeffery Paul Do hereby Swear
that I placed this in the US Postal Service for the 8th
circuit Court of Appeals, on 8/27/2013, original draft.

In The 8th Circuit Court of Appeals

- Appellants Brief -

United States
V. Plaintiff

Jeffery W. Paul
Defendant

Case No. 6:96 CR 60022-001
JLH/BAB

- For; Application for Writ; (&) Relief; ch. 153;
Habeas Corpus; §2255.

- Summary -

(1) Petitioner was convicted (&) Sentenced to death in June, 1997; under the Principal; equally Culpable Codefendants clause/section; but the perpetrator exonerates me in statements submitted in pretrial investigations; but because they were in slang (&) often lacked context, they were omitted.

(2) This petitioner claims to be the person who notified deputy (&) informant/associates of the shooting incident because perpetrator had claimed self defense (&) legal insanity; but contacts inhibited (&) obstructed petitioner resulting in inconsistent statements, FBI, construed as suspicious (&) confessional; though petitioner denied any involvement in crime or incidental crime (&) was found not guilty of incidental crime (&) other factors alleged to be motive; (&) aggravating factors; though the offense class was not dropped.

(3) Petitioner claims perpetrator was ordered to remain silent while prosecution read his confession into record, inculpating me as well, when I was not present.

④. This petitioner is learning disabled ($) suffering from austere, cruel conditions of captivity ($) estrangement ($) has little advise or opportunity to check math for illegal (8th Amendment) penalty claim; but previously had (2 ) other transcripts of perpetrators confession; but no resource or counsel for sending that for appeal.

⑤. Petitioner claims; statute is unambiguous; ($) clearly delineates between birthday; ($) age; ($) petitioner claims, the proper way to determine the age is multiply 365 by whole years; ($) add the months for a total of days; then divide by 365; for the year ($) months remaining; which means I was 17yrs, 9mos. 27days on the offense date; see documents; (1) through (11); ($) that; for youthful offenders; 18 years is minor; ($) with full faith ($) credit, (via) equal protection clause; Court is obligated to review offense; ($) exclude death penalty; ($) compensate for cooperating witness ($) minor capacity; with or without exoneration of Trinitys. statement; ($) that failing to do so; constitutes a 8th Amendment violation; ($) is also a prima facie complaint.

Respectfully Submitted;

x [signature] Jeffery Paul W.
10517042
PO Box 33, Terre Haute IN.
47808

Certificate of Service; I; Jeffery W. Paul, do hereby certify that a true ($) original draft of this motion was placed in the U.S. Postal Service; on 8/27/2013; to the 8th Circuit Appeal's court.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

SEP 2 4 1996
BY CHRIS R. JOHNSON, CLERK
DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 6:96CR60022-001 |
| vs. | ) | 18 U.S.C. § 1111(a) |
| | ) | 18 U.S.C. § 924(c) |
| JEFFERY WILLIAM PAUL | ) | 18 U.S.C. § 924(i)(1) |
| | | 18 U.S.C. § 2 |

## INDICTMENT

The Grand Jury charges:

### COUNT 1

On or about the 22nd day of June, 1995, in the Western District of Arkansas, Hot Springs Division, the defendant, JEFFERY WILLIAM PAUL, and another person known to the grand jury, while aiding and abetting each other, did, within the confines of Hot Springs National Park, a place within the special maritime and territorial jurisdiction of the United States, pursuant to Title 18 U.S.C. § 7(3), kill Sherman Williams, by means of gunshot wounds, in the perpetration of a robbery, in violation of 18 U.S.C. § 1111(a) and § 2.

### COUNT 2

On or about the 22nd day of June, 1995, in the Western District of Arkansas, Hot Springs Division, the defendant, JEFFERY WILLIAM PAUL, and another person known to the grand jury, while aiding and abetting each other, within the confines of Hot Springs National Park, a place within the special maritime and territorial jurisdiction of the United States, pursuant

## CHAPTER 51—HOMICIDE

Sec.
1111. Murder.
1112. Manslaughter.
1113. Attempt to commit murder or manslaughter.
1114. Protection of officers and employees of the United States.
1115. Misconduct or neglect of ship officers.
1116. Murder or manslaughter of foreign officials, official guests, or internationally protected persons.
1117. Conspiracy to murder.
1118. Murder by a Federal prisoner.
1119. Foreign murder of United States nationals.
1120. Murder by escaped prisoners.
1121. Killing persons aiding Federal investigations or State correctional officers.
1122. Protection against the human immunodeficiency virus.

## § 1111. Murder

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

(c) For purposes of this section—

(1) the term "assault" has the same meaning as given that term in section 113;

(2) the term "child" means a person who has not attained the age of 18 years and is—

(A) under the perpetrator's care or control; or

(B) at least six years younger than the perpetrator;

(3) the term "child abuse" means intentionally or knowingly causing death or serious bodily injury to a child;

(4) the term "pattern or practice of assault or torture" means assault or torture engaged in on at least two occasions;

(5) the term "serious bodily injury" has the meaning set forth in section 1365; and

(6) the term "torture" means conduct, whether or not committed under the color of law, that otherwise satisfies the definition set forth in section 2340(1).

(June 25, 1948, c. 645, 62 Stat. 756; Oct. 12, 1984, Pub.L. 98–473, Title II, § 1004, 98 Stat. 2138; Nov. 10, 1986, Pub.L. 99–646, § 87(c)(4), 100 Stat. 3623; Nov. 14, 1986, Pub.L. 99–654, § 3(a)(4), 100 Stat. 3663; Nov. 18, 1988, Pub.L. 100–690, Title VII, § 7025, 102 Stat. 4397; Sept. 13, 1994, Pub.L. 103–322, Title VI, § 60003(a)(4), 108 Stat. 1969; Apr. 30, 2003, Pub.L. 108–21, Title I, § 102, 117 Stat. 652.)

### HISTORICAL AND STATUTORY NOTES

**Effective and Applicability Provisions**

**1986 Acts.** Amendment by section 87 of Pub.L. 99–646 effective 30 days after Nov. 10, 1986, see section 87(e) of Pub.L. 99–646, set out as a note under section 2241 of this title.

## § 1112. Manslaughter

(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

Voluntary—Upon a sudden quarrel or heat of passion.

Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of voluntary manslaughter, shall be fined under this title or imprisoned not more than 15 years, or both;

Whoever is guilty of involuntary manslaughter, shall be fined under this title or imprisoned not more than 8 years, or both.

(June 25, 1948, c. 645, 62 Stat. 756; Sept. 13, 1994, Pub.L. 103–322, Title XXXII, § 320102, Title XXXIII, § 330016(1)(H), 108 Stat. 2109, 2147; Oct. 11, 1996, Pub.L. 104–294, Title VI, § 604(b)(13), 110 Stat. 3507; Jan. 7, 2008, Pub.L. 110–177, Title II, § 207, 121 Stat. 2538.)

### HISTORICAL AND STATUTORY NOTES

**Effective and Applicability Provisions**

**1996 Acts.** Amendment by section 604 of Pub.L. 104–294 effective Sept. 13, 1994, see section 604(d) of Pub.L. 104–294, set out as a note under section 13 of this title.

**1990:** *Cruzan v. Missouri.* The Court ruled that a person had the right to refuse life-sustaining medical treatment. However, the Court also ruled that, before treatment could be withheld from a comatose patient, a state could require "clear and convincing evidence" that the patient would not have wanted to live. In two 1997 rulings, *Washington v. Glucksberg* and *Vacco v. Quill,* the Court ruled that states could ban doctor-assisted suicide.

**1995:** *Adarand Constructors, Inc., v. Peña.* The Court held that federal programs that classify people by race, unless "narrowly tailored" to accomplish a "compelling governmental interest," may violate the right to equal protection.

**1995:** *U.S. Term Limits Inc. v. Thornton.* The Court ruled that neither states nor Congress could limit terms of members of Congress, since the Constitution reserves to the people the right to choose federal lawmakers.

**1997:** *Clinton v. Jones.* Rejecting an appeal by Pres. Clinton in a sexual harassment suit, the Court ruled that a sitting president did not have temporary immunity from a lawsuit for actions outside the realm of official duties.

**1997:** *City of Boerne v. Flores.* The Court overturned a 1993 law banning enforcement of laws that "substantially burden" religious practice unless there is a "compelling need" to do so. The Court held that the act was an unwarranted intrusion by Congress on states' prerogatives and an infringement of the judiciary's role.

**1997:** *Reno v. ACLU.* Citing the right to free expression, the Court overturned a provision making it a crime to display or distribute "indecent" or "patently offensive" material on the Internet. The Court ruled, however, in *NEA v. Finley* (1998) that "general standards of decency" may be used as a criterion in federal arts funding.

**1998:** *Clinton v. City of New York.* The Court struck down the Line-Item Veto Act (1996), holding that it unconstitutionally gave the president "the unilateral power to change the text of duly enacted statutes."

**1998:** *Faragher v. City of Boca Raton; Burlington Industries, Inc. v. Ellerth.* The Court issued new guidelines for workplace sexual harassment suits, holding employers responsible for misconduct by supervisory employees. And in *Oncale v. Sundowner Offshore Services,* the Court ruled that the law against sexual harassment applies regardless of whether harasser and victim are the same sex.

**1999:** *Dept. of Commerce v. U.S. House.* Upholding a challenge to plans for the 2000 census, the Court prohibited statistical sampling, favored by Democrats, in the apportioning of seats in the U.S. House of Representatives. The Court maintained that an actual head count was required.

**1999:** *Alden v. Maine; Florida Prepaid v. College Savings Bank; College Savings Bank v. Florida.* In a series of rulings, the Court applied the principle of "sovereign immunity" to shield states in large part from being sued under federal law.

**2000:** *Boy Scouts of America v. Dale.* The Court ruled that the Boy Scouts could dismiss a troop leader after learning he was gay, holding that the right to freedom of association outweighed a New Jersey antidiscrimination statute.

**2000:** *Stenberg v. Carhart.* The Court struck down a Nebraska law that banned so-called partial-birth abortion. It argued that the law could be interpreted as banning other abortion procedures and that it should have made exception for reasons of health. (*See* **1973:** *Roe v. Wade.*)

**2000:** *Bush v. Gore.* The Court ruled that manual recounts of presidential ballots in the Nov. 2000 election could not proceed because inconsistent evaluation standards in different counties violated the equal protection clause. In effect, the ruling meant existing official results leaving George W. Bush as narrow winner of the election would prevail.

**2001:** *Easley v. Cromartie.* The Court ruled that North Carolina's 12th Congressional District, whose irregular shape had been challenged as an unconstitutional racial gerrymander, was the permissible result of attempts to create a majority-Democrat district.

**2001:** *Good News Club v. Milford Central School.* The justices found that religious and secular organizations were entitled to equal access to public elementary school grounds for after-school meetings.

**2002:** *Atkins v. Virginia.* The Court ruled that the execution of mentally retarded felons violated the 8th Amendment ban on "cruel and unusual punishment."

**2002:** *Ring v. Arizona.* The Court found that only a jury, not a judge, could decide to impose the death penalty.

**2002:** *Zelman v. Simmons-Harris.* The Court ruled that publicly funded tuition vouchers could be used at religious schools without violating the separation of church and state.

**2002:** *Federal Maritime Commission v. South Carolina State Ports Authority.* The Court ruled that the 11th Amendment gave states immunity from private lawsuits involving federal agencies.

**2003:** *Grutter v. Bollinger; Gratz v. Bollinger.* The Court upheld affirmative action in admission policies at the Univ. of Michigan Law School. However, in a second decision, the Court ruled against a strict point system based on racial and ethnic backgrounds, as used in the university's undergraduate admissions process.

**2004:** *Tennessee v. Lane.* The Court ruled that disabled individuals could sue states under the Americans with Disabilities Act for failing to provide adequate access to state courthouses, despite states' usual immunity from private lawsuits in federal court.

**2004:** *Locke v. Davey.* The justices decided that a scholarship program provided by the state of Washington did not violate the right to free exercise of religion in denying aid to students preparing for the clergy.

**2004:** *Ashcroft v. ACLU et al.* The Court struck down the Child Online Protection Act, which Congress passed in 1998 to restrict access to online pornography by minors, on the basis that the law, as written, violated the 1st Amendment right of free speech.

**2005:** *Kelo v. City of New London.* The Court ruled that local governments could force property owners to sell their land in order to facilitate private development projects deemed to be economically beneficial to the community.

**2005:** *Roper v. Simmons.* The Court ruled that executions of convicts who committed their crimes before age 18 were prohibited under the 8th Amendment ban on cruel and unusual punishment.

**2006:** *Garcetti v. Ceballos.* The Court ruled that the 1st Amendment guarantee of free speech did not protect statements made by public employees in the course of their official duties.

**2006:** *Hamdan v. Rumsfeld.* The Court ruled that Pres. George W. Bush's system for trying terrorism detainees at the U.S. military base in Guantanamo Bay, Cuba, was unauthorized under both federal law and the international Geneva Conventions.

**2007:** *Gonzales v. Carhart et al.; Gonzales v. Planned Parenthood Federation of America.* The Court upheld a 2003 federal law prohibiting the abortion procedure known as intact dilation and extraction, or "partial-birth" abortion.

**2007:** *Parents Involved in Community Schools v. Seattle School District No. 1; Madison v. Jefferson County Board of Education.* The Court ruled that two school districts could not, to encourage diversity, use "racial classifications in making school assignments."

**2008:** *Boumediene v. Bush.* The Court ruled that the guarantee of habeas corpus applied at the U.S. naval base at Guantanamo Bay, Cuba, and that detainees had a constitutional right to challenge their detention in federal court.

**2008:** *Kennedy v. Louisiana.* The Court ruled that death was a disproportionate penalty, and prohibited by the Constitution, in cases of child rape that did not result in the death of the victim.

**2008:** *District of Columbia vs. Heller.* The Court overturned Washington, DC's handgun ban, ruling that the 2nd Amendment protected individuals' right to own guns for personal use.



# PART IV—CORRECTION OF YOUTHFUL OFFENDERS

| Chapter | | Section |
|---|---|---|
| 401. | General provisions | 5001 |
| [402. | Repealed] | |
| 403. | Juvenile delinquency | 5031 |

### HISTORICAL AND STATUTORY NOTES

**1984 Amendment**

Pub.L. 98–473, Title II, § 218(g), substituted "Repealed" for "Federal Youth Corrections Act" in item for chapter 402.

**1950 Amendment**

Act Sept. 30, 1950, c. 1115, § 5(a), 64 Stat. 1090, added item for chapter 402.

## CHAPTER 401—GENERAL PROVISIONS

**Sec.**
5001. Surrender to State authorities; expenses.
5002. Repealed.
5003. Custody of State offenders.

**1996 Amendments**

Pub.L. 104–134, Title I, § 101[a][Title VI, § 614(a)(2)], Apr. 26, 1996, 110 Stat. 1321–65; renumbered Title I Pub.L. 104–140, § 1(a), May 2, 1996, 110 Stat. 1327, struck out item 5002, which established an Advisory Corrections Council.

**1952 Amendment**

Act May 9, 1952, c. 253, § 2, 66 Stat. 68, added item "5003".

**1950 Amendment**

Act Sept. 30, 1950, c. 1115, § 5(b), 64 Stat. 1090, added item "5002".

**Savings Provisions of Pub.L. 98–473, Title II, c. II**

See section 235 of Pub.L. 98–473, Title II, c. II, Oct. 12, 1984, 98 Stat. 2031, as amended, set out as a note under section 3551 of this title.

## § 5001. Surrender to State authorities; expenses

Whenever any person under twenty-one years of age has been arrested, charged with the commission of an offense punishable in any court of the United States or of the District of Columbia, and, after investigation by the Department of Justice, it appears that such person has committed an offense or is a delinquent under the laws of any State or of the District of Columbia which can and will assume jurisdiction over such juvenile and will take him into custody and deal with him according to the laws of such State or of the District of Columbia, and that it will be to the best interest of the United States and of the juvenile offender, the United States attorney of the district in which such person has been arrested may forego his prosecution and surrender him as herein provided, unless such surrender is precluded under section 5032 of this title.

The United States marshal of such district upon written order of the United States attorney shall convey such person to such State or the District of Columbia, or, if already therein, to any other part thereof and deliver him into the custody of the proper authority thereof.

Before any person is conveyed from one State to another or from or to the District of Columbia under this section, he shall signify his willingness to be so returned, or there shall be presented to the United States attorney a demand from the executive authority of such State or the District of Columbia, to which the prisoner is to be returned, supported by indictment or affidavit as prescribed by section 3182 of this title.

The expense incident to the transportation of any such person, as herein authorized, shall be paid from the appropriation "Salaries, Fees, and Expenses, United States Marshals."

(June 25, 1948, c. 645, 62 Stat. 857; Nov. 18, 1988, Pub.L. 100–690, Title VI, § 6467(b), 102 Stat. 4376.)

## § 25. Use of minors in crimes of violence

(a) **Definitions.**—In this section, the following definitions shall apply:

(1) **Crime of violence.**—The term "crime of violence" has the meaning set forth in section 16.

(2) **Minor.**—The term "minor" means a person who has not reached 18 years of age.

(3) **Uses.**—The term "uses" means employs, hires, persuades, induces, entices, or coerces.

(b) **Penalties.**—Any person who is 18 years of age or older, who intentionally uses a minor to commit a crime of violence for which such person may be prosecuted in a court of the United States, or to assist in avoiding detection or apprehension for such an offense, shall—

Del. 3

REGNO..: 16517-042 NAME: PAUL, JEFFERY WILLIAM


FBI NO............: 220926WA9          DATE OF BIRTH: 09-02-1976
ARS1..............: THP/A DES
UNIT..............: SCU                QUARTERS.....: X03-310L
DETAINERS.........: NO                 NOTIFICATIONS: NO

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE: DEATH SENT


------------------------CURRENT JUDGMENT/WARRANT NO: 020 --------------------

COURT OF JURISDICTION.............: ARKANSAS, WESTERN DISTRICT
DOCKET NUMBER.....................: 96-60022-001
JUDGE.............................: HENDREN
DATE SENTENCED/PROBATION IMPOSED: 06-25-1997
DATE COMMITTED....................: 07-01-1997
HOW COMMITTED.....................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED.................: NO

                 FELONY ASSESS  MISDMNR ASSESS   FINES        COSTS
NON-COMMITTED.:  $200.00        $00.00           $00.00       $00.00

RESTITUTION...: PROPERTY: NO  SERVICES: NO      AMOUNT: $00.00
------------------------CURRENT OBLIGATION NO: 010 --------------------------
OFFENSE CODE....: 721
OFF/CHG: T18:1111(A) & 2; KILL IN THE PERPETRATION OF A ROBBERY, AIDING
         AND ABETTING (COUNT 1). T18:924(C)(1),924(I)(1) & 2; KNOWINGLY
         CARRY AND USE A FIREARM, DEATH OF A PERSON THROUGH THE USE OF
         A FIREARM & AIDING AND ABETTING (COUNT 2)

SENTENCE PROCEDURE...............: 3559 VCCLEA VIOLENT SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.: DEATH
DATE OF OFFENSE..................: 06-22-1995

*(handwritten)*
(Dob) 1976 (=) 3 months 29 days
1995 (=) 5 months 22 days

1994 - 1977 (=) 17 years

for; Maximum age (=) 17 yrs/mos, 21 days

G0002     MORE PAGES TO FOLLOW . . . .

DOC
5-

REGNO..: 10517-042 NAME: PAUL, JEFFERY WILLIAM


FBI NO...........: 220926WA9          DATE OF BIRTH: 09-02-1976
ARS1.............: THP/A-DES
UNIT.............: SCU                 QUARTERS.....: X03-310L
DETAINERS........: NO                  NOTIFICATIONS: NO


THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  DEATH SENT


--------------------------CURRENT JUDGMENT/WARRANT NO: 020 --------------------------

COURT OF JURISDICTION...........: ARKANSAS, WESTERN DISTRICT
DOCKET NUMBER...................: 96-60022-001
JUDGE...........................: HENDREN
DATE SENTENCED/PROBATION IMPOSED: 06-25-1997
DATE COMMITTED..................: 07-01-1997
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO


                 FELONY ASSESS   MISDMNR ASSESS   FINES        COSTS
NON-COMMITTED.: $200.00         $00.00           $00.00       $00.00

RESTITUTION...: PROPERTY: NO  SERVICES: NO       AMOUNT: $00.00

------------------------CURRENT OBLIGATION NO: 010 --------------------------
OFFENSE CODE....: 721
OFF/CHG: T18:1111(A) & 2; KILL IN THE PERPETRATION OF A ROBBERY, AIDING
         AND ABETTING (COUNT 1). T18:924(C)(1),924(I)(1) & 2; KNOWINGLY
         CARRY AND USE A FIREARM, DEATH OF A PERSON THROUGH THE USE OF
         A FIREARM & AIDING AND ABETTING (COUNT 2)

SENTENCE PROCEDURE..............: 3559 VCCLEA VIOLENT SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.: DEATH
DATE OF OFFENSE.................: 06-22-1995

Authorized by the Act
July 7, 1955 to Administer
Oaths (18 U.S.C. 4004)

_Case Manager_

Doc.

# CALENDAR

## Julian and Gregorian Calendars; Leap Year; Century

The Julian calendar, under which all Western nations measured time until 1582 CE, was authorized by Julius Caesar in 46 BCE. It called for a year of 365¼ days, starting in January, with every 4th year being a **leap year** of 366 days. St. Bede, an Anglo-Saxon monk also known as the Venerable Bede, announced in 730 CE that the Julian year was 11 min., 14 sec. too long, a cumulative error of about a day every 128 years, but nothing was done about this for centuries.

By 1582 the accumulated error was estimated at 10 days. In that year Pope Gregory XIII decreed that the day following Oct. 4, 1582, should be called Oct. 15, thus dropping 10 days and initiating the **Gregorian calendar.**

The Gregorian calendar continued a system devised by the monk Dionysius Exiguus (6th century), starting from the first year following the birth of Jesus Christ, which was inaccurately taken to be year 753 in the Roman calendar. Leap years were continued but, to prevent further displacements, centesimal years (years ending in 00) were made common years, not leap years, unless divisible by 400. Under this plan, 1600 and 2000 were leap years (as was 2004); 1700, 1800, and 1900 were not.

The Gregorian calendar was adopted at once by France, Italy, Spain, Portugal, and Luxembourg. Within 2 years most German Catholic states, Belgium, and parts of Switzerland and the Netherlands were brought under the new calendar, and Hungary followed in 1587. The rest of the Netherlands, along with Denmark and the German Protestant states, made the change in 1699-1700.

The British government adopted the Gregorian calendar and imposed it on all its possessions, including the American colonies, in 1752, decreeing that the day following Sept. 2, 1752, should be called Sept. 14, a loss of 11 days. All dates preceding were marked OS, for Old Style. In addition, New Year's Day was moved to Jan. 1 from Mar. 25 (under the old reckoning, for example, Mar. 24, 1700, had been followed by Mar. 25, 1701). Thus George Washington's birthdate, which was Feb. 11, 1731, OS, became Feb. 22, 1732, NS (New Style). In 1753 Sweden also went Gregorian.

In 1793 the French revolutionary government adopted a calendar of 12 months of 30 days each with 5 extra days in September of each common year and 6 extra days every 4th year. Napoleon reinstated the Gregorian calendar in 1806.

The Gregorian system later spread to non-European regions, replacing traditional calendars at least for official purposes. Japan in 1873, Egypt in 1875, China in 1912, and Turkey in 1925 made the change, usually in conjunction with political upheaval. In China, the republican government began reckoning years from its 1911 founding. After 1949, the People's Republic adopted the Common, or Christian Era, year count, even for the traditional lunar calendar, which it retained. In 1918 the Soviet Union decreed that the day after Jan. 31, 1918, OS, would be Feb. 14, 1918, NS. Greece changed over in 1923. For the first time in history, all major nations had one calendar. The Russian Orthodox church and some other Christian sects retained the Julian calendar.

To convert from the Julian to the Gregorian calendar, add 10 days to dates Oct. 5, 1582, through Feb. 28, 1700; after that date add 11 days through Feb. 28, 1800; 12 days through Feb. 28, 1900; and 13 days through Feb. 28, 2100.

A **century** consists of 100 consecutive years. The 1st century CE may be said to have run from the years 1 through 100. The 20th century by this reckoning consisted of the years 1901 through 2000 and ended Dec. 31, 2000, as did the 2nd millennium CE. The 21st century thus technically began Jan. 1, 2001.

For a **Perpetual Calendar,** see pages 360-61.

|  | JANUARY |  |  |  |  |  |  | FEBRUARY |  |  |  |  |  |  | MARCH |  |  |  |  |  |  | APRIL |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S |
|  |  |  |  |  |  | 1 |  |  | 1 | 2 | 3 | 4 | 5 |  |  | 1 | 2 | 3 | 4 | 5 |  |  |  |  |  | 1 | 2 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 | 27 | 28 |  |  |  |  |  | 27 | 28 | 29 | 30 | 31 |  |  | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 30 | 31 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

|  | MAY |  |  |  |  |  |  | JUNE |  |  |  |  |  |  | JULY |  |  |  |  |  |  | AUGUST |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |  |  |  | 1 | 2 | 3 | 4 |  |  |  |  |  | 1 | 2 |  | 1 | 2 | 3 | 4 | 5 | 6 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 29 | 30 | 31 |  |  |  |  | 26 | 27 | 28 | 29 | 30 |  |  | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 28 | 29 | 30 | 31 |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  | 31 |  |  |  |  |  |  |  |  |  |  |  |  |  |

|  | SEPTEMBER |  |  |  |  |  |  | OCTOBER |  |  |  |  |  |  | NOVEMBER |  |  |  |  |  |  | DECEMBER |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S |
|  |  |  |  | 1 | 2 | 3 |  |  |  |  |  |  | 1 |  |  | 1 | 2 | 3 | 4 | 5 |  |  |  |  | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 |  | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 27 | 28 | 29 | 30 |  |  |  | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|  |  |  |  |  |  |  | 30 | 31 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

## The Julian Period

How many days have you lived? To determine this, multiply your age by 365, add the number of days since your last birthday, and account for all leap years. Chances are your calculations will go wrong somewhere. Astronomers, however, find it convenient to express dates and time intervals in days rather than in years, months, and days. This is done by placing events within the Julian period.

The Julian period was devised in 1582 by the French classical scholar Joseph Scaliger (1540-1609), who named it after his father, Julius Caesar Scaliger, not after the Julian calendar as might be supposed.

Scaliger began with a zero hour, or starting time, of noon on Jan. 1, 4713 BCE (on the Julian calendar). This was the most recent time that 3 major chronological cycles began on the same day: (1) the 28-year solar cycle, after which dates in the Julian calendar (e.g., Feb. 11) return to the same days of the week (e.g., Monday); (2) the 19-year lunar cycle, after which the phases of the moon return to the same dates of the year; and (3) the 15-year indiction cycle, used in ancient Rome to regulate taxes.

It will take 7,980 years to complete the period, the product of 28, 19, and 15.

Noon (Universal Time) of Jan. 1, 2011, will be Julian Date (JD) 2,455,563; that many days will have passed since the start of the Julian period. The JD at noon of any date in 2011 may be found by adding to this figure the day of the year for that date, which can be obtained from the left half of the "How Far Apart Are Two Dates?" chart on the next page.

**year** \'yir\ *n* [ME *yere*, fr. OE *gēar*; akin to OHG *jār* year, Gk *hōros* year, *hōra* season, hour] (bef. 12c) **1 a** : the period of about 365¼ solar days required for one revolution of the earth around the sun **b** : the time required for the apparent sun to return to an arbitrary fixed or moving reference point in the sky **c** : the time in which a planet completes a revolution about the sun ⟨a ~ of Jupiter⟩ **2 a** : a cycle in the Gregorian calendar of 365 or 366 days divided into 12 months beginning with January and ending with December **b** : a period of time equal to one year of the Gregorian calendar but beginning at a different time **3** : a calendar year specified usu. by a number ⟨died in the ~ 1900⟩ **4** *pl* : a time or era having a special significance ⟨their glory ~s⟩ **5 a** : 12 months that constitute a measure of age or duration ⟨her 21st ~⟩ — often used in combination ⟨a *year*-old child⟩ **b** *pl* : AGE ⟨an adult in ~s but a child in understanding⟩; *also* : the final stage of the normal life span **6** : a period of time (as the usu. nine-month period in which a school is in session) other than a calendar year

irector, a committed youth offender conditionally under supervision he recommend to the Commission.

on may discharge a committed youth nally at the expiration of one year iditional release.

der committed under section 5010(b) l be released conditionally under sure the expiration of four years from :tion and shall be discharged uncondire six years from the date of his

der committed under section 5010(c) be released conditionally under suan two years before the expiration of ' the court. He may be discharged e expiration of not less than one year s conditional release. He shall be onally on or before the expiration of ce imposed, computed uninterruptedconviction.

f sentence authorized by any Act of e granted as a matter of right to enders but only in accordance with ie Director with the approval of the

0, c. 1115, § 2, 64 Stat. 1088, and 76, Pub.L. 94–233, §§ 7, 9, 90 Stat.

**of Commission orders**

iay revoke or modify any of its cting a committed youth offender conditional discharge.

), c. 1115, § 2, 64 Stat. 1089, and i, Pub.L. 94–233, § 9, 90 Stat. 232.)

**of released youth offenders**

fenders permitted to remain at lib. or conditionally released shall be of United States probation officers, pointed by the Attorney General, ory agents approved by the Comion is authorized to encourage the organizations composed of memithout compensation as voluntary sponsors. The powers and duties ry agents and sponsors shall be regulations adopted by the Com

c. 1115, § 2, 64 Stat. 1089, and Pub.L. 94–233, § 9, 90 Stat. 232.)

**of released offenders**

the unconditional discharge of a er, the Commission is of the opinnder will be benefited by further ion or other facility the Commisn to custody or if necessary may pprehension and return to custoender and cause such warrant to ed States probation officer, an ;ent, a United States marshal, or penal or correctional institution.

Upon return to custody, such youth offender shall be given a revocation hearing by the Commission.
(Added Sept. 30, 1950, c. 1115, § 2, 64 Stat. 1089, and amended July 17, 1970, Pub.L. 91–339, § 2, 84 Stat. 437; Mar. 15, 1976, Pub.L. 94–233, § 8, 90 Stat. 232.)

**Effective Date of Repeal.** Section 235(a)(1)(A) of Pub.L. 98–473, Title II, c. II, Oct. 12, 1984, 98 Stat. 2031, as amended by Pub.L. 99–217, § 4, Dec. 26, 1985, 99 Stat. 1728, provided that the repeal of sections 5017 to 5020 shall take effect on Oct. 12, 1984.

## [§§ 5021 to 5026. Repealed. Pub.L. 98–473, Title II, § 218(a)(8), Oct. 12, 1984, 98 Stat. 2027]

### EDITORIAL NOTES

Section 5021, added Sept. 30, 1950, c. 1115, § 2, 64 Stat. 1089, and amended Oct. 3, 1961, Pub.L. 87–336, 75 Stat. 750; Mar. 15, 1976, Pub.L. 94–233, § 9, 90 Stat. 232, related to the issuance of certificates setting aside the convictions of youthful offenders.

Section 5022, added Sept. 30, 1950, c. 1115, § 2, 64 Stat. 1089, provided that this chapter would not apply to offenses committed before its enactment.

Section 5023, added Sept. 30, 1950, c. 1115, § 2, 64 Stat. 1089, and amended Apr. 8, 1952, c. 163, § 1, 66 Stat. 45, related to the relationship between this chapter and the Probation and Juvenile Delinquency Acts.

Section 5024, added Sept. 30, 1950, c. 1115, § 2, 64 Stat. 1089, and amended Apr. 8, 1952, c. 163, § 2, 66 Stat. 45; June 25, 1959, Pub.L. 86–70, § 17(a), 73 Stat. 144; July 12, 1960, Pub.L. 86–624, § 13(b), 74 Stat. 413; Dec. 27, 1967, Pub.L. 90–226, Title VIII, § 801(a), 81 Stat. 741, provided that this chapter was applicable to the States of the United States and to the District of Columbia.

Section 5025, added Apr. 8, 1952, c. 163, § 3(a), 66 Stat. 46, and amended Dec. 27, 1967, Pub.L. 90–226, Title VIII, § 801(b), 81 Stat. 741, related to the applicability of this chapter to the District of Columbia.

Section 5026, added Apr. 8, 1952, c. 163, § 3(a), 66 Stat. 46, provided that this chapter did not affect the parole of other offenders.

**Effective Date of Repeal.** Section 235(a)(1)(A) of Pub.L. 98–473, Title II, c. II, Oct. 12, 1984, 98 Stat. 2031, as amended by Pub.L. 99–217, § 4, Dec. 26, 1985, 99 Stat. 1728, provided that the repeal of sections 5021 to 5026 shall take effect on Oct. 12, 1984.

## CHAPTER 403—JUVENILE DELINQUENCY

Sec.
5031. Definitions.
5032. Delinquency proceedings in district courts; transfer for criminal prosecution.
5033. Custody prior to appearance before magistrate.
5034. Duties of magistrate.
5035. Detention prior to disposition.
5036. Speedy trial.
5037. Dispositional hearing.
5038. Use of juvenile records.
5039. Commitment.
5040. Support.

Sec.
[5041. Repealed.]
5042. Revocation of probation.

**Analysis Applicable for Five Years After Amendment**

This analysis, applicable for five years to individual who committed offense or act of juvenile delinquency prior to Nov. 1, 1987, and as to term of imprisonment under section 235(a)(1)(B) of Pub.L. 98–473, read as follows prior to amendment by Pub.L. 98–473:

Sec.
5031. Definitions.
5032. Delinquency proceedings in district courts; transfer for criminal prosecution.
5033. Custody prior to appearance before magistrate.
5034. Duties of magistrate.
5035. Detention prior to disposition.
5036. Speedy trial.
5037. Dispositional hearing.
5038. Use of juvenile records.
5039. Commitment.
5040. Support.
5041. Parole.
5042. Revocation of parole or probation.

For applicability of sentencing provisions to offenses, see Effective Date and Savings Provisions, etc., note, section 235 of Pub.L. 98–473, as amended, set out under section 3551 of this title.

### EDITORIAL NOTES

**Codification.** Amendment by section 3599H of Pub.L. 101–647 directed the substitution of "probation" for "Probation" in item 5042. Prior amendment by Pub.L. 98–473 directed the substitution of "5042. Revocation of Probation." for "5042. Revocation of probation.", however, such amendment was not executed to item 5042, and further change is not required.

## § 5031. Definitions

For the purposes of this chapter, a "juvenile" is a person who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday, and "juvenile delinquency" is the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult.
(As amended Sept. 7, 1974, Pub.L. 93–415, Title V, § 501, 88 Stat. 1133.)

### REVISION NOTES

Based on title 18, U.S.C., 1940 ed., § 921 (June 16, 1938, ch. 486, § 1, 52 Stat. 764).

The phrase "who has not attained his eighteenth birthday" was substituted for "seventeen years of age or under" as more clearly reflecting congressional intent and administrative construction. The necessity of a definite fixing of the age of the juvenile was emphasized by Hon. Arthur J. Tuttle, United States district judge, De

As discussed elsewhere in this Brief, Paul was only eighteen years old at the time, and was thus younger than Ingle. T. 978, DE 1 (birth certificate of Jeffery Paul); App. 501, 514 (Ingle nineteen years old at time of offense); see also Claim II.

Importantly here, Jeffery Paul's prior criminal history was far less substantial than that of Trinity Ingle. While Paul had a relatively minor criminal history, Ingle had five prior felony convictions, including two burglary convictions and two firearms convictions. T. 567; App. 472-73.

The government charged and tried both Mr. Paul's case, and that of his co-defendant, Trinity Ingle, on a theory of aiding and abetting, 18 U.S.C. §2, although in each trial, the government contradictorily argued that the defendant on trial had actually shot the victim. Mr. Ingle received a life sentence for the same offenses less than three weeks before Mr. Paul received a death sentence.

4.  Evidence of Equal Culpability – Trinity Ingle Trial

The government's evidence of Ingle's primary role in the offense was more substantial than that presented or argued by the government during Mr. Paul's trial. At Ingle's trial, government witness Derrick Bell testified that Ingle had repeatedly told him, at least five times, that he personally had hit and shot Sherman Williams, in the head and chest. App. 312-13, 320.[8] Ingle told Bell he was the one who struck the victim immediately after they first confronted him and asked for the time. App. 316.

**minimal participant.** *Criminal law.* Under the federal sentencing guidelines, a defendant who is among the least culpable of a group of criminal actors, as when the defendant does not understand the scope or structure of the criminal enterprise or the actions of the other members of the group. ● The offense level for a crime of a minimal participant can be decreased by four levels. *U.S. Sentencing Guidelines Manual* § 3B1.2(a). Cf. MINOR PARTICIPANT. [Cases: Sentencing and Punishment ☞764.]

**minimal scrutiny.** See RATIONAL-BASIS TEST.

**minor participant.** *Criminal law.* Under the federal sentencing guidelines, a defendant who is less culpable for a crime than the other members of the group committing the crime, but who has more culpability than a minimal participant. ● A defendant who is a minor participant can have the offense level for the crime decreased by two levels. *U.S. Sentencing Guidelines Manual* § 3B1.2(b). Cf. MINIMAL PARTICIPANT. [Cases: Sentencing and Punishment ☞764.]

## HISTORICAL AND STATUTORY NOTES

**Effective and Applicability Provisions**

1996 Acts. Amendment by Pub.L. 104–132 to be effective, to the extent constitutionally permissible, for sentencing proceedings in cases in which the defendant is convicted on or after Apr. 24, 1996, see section 211 of Pub.L. 104–132, set out as a note under section 2248 of this title.

1986 Acts. Section 20(c) of Pub.L. 99–646 provided that: "The amendments made by this section [amending this section and section 3663 of this title] shall take effect on the date of the taking effect of section 212(a)(2) of the Sentencing Reform Act of 1984 [see Effective Date note below]."

1984 Acts. Section effective on the first day of first calendar month beginning thirty-six months after Oct. 12, 1984, applicable only to offenses committed after taking effect of sections 211 to 239 of Pub.L. 98–473, and except as otherwise provided for therein, see section 235 of Pub.L. 98–473 as amended, set out as a note under section 3551 of this title.

## § 3557.   Review of a sentence

The review of a sentence imposed pursuant to section 3551 is governed by the provisions of section 3742.

(Added Pub.L. 98–473, Title II, § 212(a)(2), Oct. 12, 1984, 98 Stat. 1991.)

### HISTORICAL AND STATUTORY NOTES

**Effective and Applicability Provisions**

1984 Acts. Section effective on the first day of first calendar month beginning thirty-six months after Oct. 12, 1984, applicable only to offenses committed after taking effect of sections 211 to 239 of Pub.L. 98–473, and except as otherwise provided for therein, see section 235 of Pub.L. 98–473, as amended, set out as a note under section 3551 of this title.

## § 3558.   Implementation of a sentence

The implementation of a sentence imposed pursuant to section 3551 is governed by the provisions of chapter 229.

(Added Pub.L. 98–473, Title II, § 212(a)(2), Oct. 12, 1984, 98 Stat. 1991.)

### HISTORICAL AND STATUTORY NOTES

**Effective and Applicability Provisions**

1984 Acts. Section effective on the first day of first calendar month beginning thirty-six months after Oct. 12, 1984, applicable only to offenses committed after taking effect of sections 211 to 239 of Pub.L. 98–473, and except as otherwise provided for therein, see section 235 of Pub.L. 98–473, as amended, set out as a note under section 3551 of this title.

## § 3559.   Sentencing classification of offenses

(a) **Classification.**—An offense that is not specifically classified by a letter grade in the section defining it, is classified if the maximum term of imprisonment authorized is—

(1) life imprisonment, or if the maximum penalty is death, as a Class A felony;

(2) twenty-five years or more, as a Class B felony;

(3) less than twenty-five years but ten or more years, as a Class C felony;

(4) less than ten years but five or more years, as a Class D felony;

(5) less than five years but more than one year, as a Class E felony;

(6) one year or less but more than six months, as a Class A misdemeanor;

(7) six months or less but more than thirty days, as a Class B misdemeanor;

(8) thirty days or less but more than five days, as a Class C misdemeanor; or

(9) five days or less, or if no imprisonment is authorized, as an infraction.

(b) **Effect of classification.**—Except as provided in subsection (c), an offense classified under subsection (a) carries all the incidents assigned to the applicable letter designation, except that the maximum term of imprisonment is the term authorized by the law describing the offense.

Jeffery Paul 10517042
P.O. Box 33 T
Terre Haute, IN 47808

INDIANAPOLIS IN 460
19 JUL 2013 PM 5 L

Legal Mail

JUL 22 2013
U.S. CLERK'S OFFICE

C/o The clerk; (6:96 cr 60022)
USDC; Western District
35 E. Mountain, Room 510
Fayetteville, AR. 72701

72701535335

U.S. Penitentiary
Terre Haute, IN 47808
Date

The enclosed letter was processed through special mailing procedures for forwarding to you. The letter has been neither opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or clarification. If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address.

17

35 E. Mountain, Room 510                                    (479) 521-6980
FAYETTEVILLE, ARKANSAS 72701                                FAX (479) 575-0774
FAY_info@arwd.uscourt.gov

July 24, 2013

Jeffery William Paul #10517-042
U.S. Penitentiary
Inmate Mail/Parcels
P.O. Box 33
Terre Haute, IN 47808

Dear Mr. Paul,

Enclosed please find your document titled "Motion to Vacate" that was received in our office 7/23/13. Also enclosed is a courtesy copy of document #390, Magistrate Judge's Report and Recommendation filed 7/22/13. Your document is being returned to you unfiled. Magistrate Judge Barry Bryant has instructed this office to accept no further pro se filings from you until the district judge rules on the enclosed Report and Recommendation.

Thank you,

June Newland
Deputy Clerk

Enclosures

cc with enclosures:
Jennifer Merrigan
Robert L. McGlasson
Sean D. O'Brien
Court file

Eastern District of AR, (USDC)

Jeffery Paul
Plaintiff

v.

United States of America
Defendant

case no 6: 96 cr 6022

cv 13 cv 06614
BAB / JLH

JUL 2 3 2013

U.S. DISTRICT COURT OFFICE

Motion to vacate ($) correct conviction ($) sentence, pursuant to Habeas Corpus, Ch. 153 §2255; FCC&R-

Comes now the petitioner does submit this Motion; pursuant to Due process of law;

(1) Petitioner prose is Represented by Counsel of Record, MS. Jennifer A. Merrigan ($) Mr. Sean O'Brien; whose information is on record as Court appointed counsel.

(2) Petitioner did receive a 3 page Affidavit from that office; Fed Defenders of Delaware; 800 king Street, Suite 200; Wilmington, DE. 19801, on 7/11/2013; Signed by Mr. Trinity Edward Ingles.

(3) Petitioner claims that his statement is wholly exhonerating ($) the arrest ($) subsequent trial was a 4th, 5th amendment violation ($) conditions of captivity; disparate ($) cruel, violation of 8th Amendment ($) 14th, 1st, 2nd, 3rd, 9th, US. Constitution ($) resulted in gross personal injury; compound crimes including, sexual abuse ($) anti trust violations.

(4) Petitioner denies having any afore knowledge of Trinity's intent to commit Robbery or Retention of pistol on June 22, 1995; ($) denys' striking subject or witnessing any blows that would supposedly produce the type of injury sustained ($) claims



(4) continuing, that the only money seen with First Class was his own, supposedly; (5) that statements which were attributed to me were out of context (6) respiratory denials.

(5.) Petitioner claims that he is learning disabled (+ suffering extensively, requests entire conviction be expunged, an attorney be appointed to argue for assessment of money damages due; (6) remedial health care, (7) due process for criminal complaints resulting from offenses, resulting from enhancement (8) disparagement, duress.

Respectfully Submitted;

a ~~Jeffrey Wm Paul~~
Jeffrey Paul W.
P.O. Box 33, Terre Haute, IN
47808

— Certified, this was placed in U.S. postal service on;
7/18/2013 —

15.

 
EDSON A. BOSTIC
FEDERAL PUBLIC DEFENDER

KARL D. SCHWARTZ
CHIEF, CAPITAL HABEAS UNIT

July 11, 2013

JENNIFER A. MERRIGAN
ASSISTANT DEFENDER,
CAPITAL HABEAS UNIT

Jeffery Paul, # 10517-042
United States Penitentiary
P.O.Box 33
Terre Haute, IN 47808-0033

Jeff,

It was good to talk to you today. I am enclosing the affidavit you requested. I ordered you the Almanac and Dictionary, you should receive them soon. I know that you have requested other books, and I have let the team know.

Sincerely,

Jennifer Merrigan

Enclosures

*Ms. Jennifer Merrigan*
*800 King Street, Suite 200*
*Wilmington, DE. 19801*
*(Cell Ph) 302/573/6010*

16

County of ᒍ•ffₑₓₛₒₙ

State of Texas

<u>Declaration of Trinity E. Ingle</u>

My name is Trinity Ingle. I am over the age of 18 and competent to make the declarations contained herein.

On June 22, 1995 me and Jeff were downtown in Hot Springs by the Arlington Hotel. I was wanting to rob a shop downstairs. Jeff was high and was pretty much just following me where I was going to. I was high too otherwise I would not have been wanting to rob a shop in broad daylight. But so we're standing outside of the mall when Mr. Williams drove by. I had not slept for days and was high on Methamphetamine which can make you paranoid and was making me paranoid after ten days of it and not sleeping. It was one of those times where if things had gone different, if a cop car had come by or something like that, I would have just left, but when Mr. Williams drove by he looked at me and I just locked in on him. In my paranoia I knew he had seen the gun in my waistband and knew that now he knew what I was thinking to do by robbing the shop downstairs. So when he got out of the car I told Jeff to come on and follow me. At this point Jeff did not know what I was doing and so he wasn't arguing any about it yet. As far as I knew, Jeff did not know that I had a gun. I didn't tell Jeff about my suspicions of Mr. Williams, nor did I say anything to him about what I planned to do.

A02253

ᴎ

I followed Mr. Williams up the trail and Jeff was following me. I stopped him by asking him if he had the time. After he told us the time I pulled the gun out and told him to give up everything he had. When he didn't, I hit him and kicked him on the ground. By this time, Jeff was getting very nervous. He was trying to get me to leave, saying, "come on, let's go." But I wasn't about to leave, but I still had the gun in my hand and Jeff knew it.

I told Jeff to keep quiet and I tied the guy up with the tape. Then Jeff and I started back down the trail but when I looked back at him the guy was looking right at me. I turned to go back but Jeff grabbed me by the arm and said, "let's just leave him and get out of here." Jeff kept arguing with me but I yanked free of him holding me. I still had the gun in my hand and Jeff was looking at it as I held it in his direction. Even though Jeff didn't know what it was I was going back up the mountain for, I made sure he knew if he put his hands on me again trying to stop me I would have shot him, too, and it would have been two people left up on that mountain.

So I walked back up the trail and asked the guy if he was going to call the cops. He said no but of course I knew he was lying. So I stood over him and shot him in the chest but one shot was rat shot which I had forgot was in the chamber. I heard Jeff yelling at me to stop, but I turned back around and shot Mr. Williams

2

A02254

with the real bullet in the head.

Everything else I believe is already known which followed that.

The gun I got from a burglary off Higden Ferry Road, New Oscar Point and Amity. It was a brown and yellow house and part of the yard was fences. It was in the morning that I broke into the house and found the guns in a closet. I think I recall that they were in a box on the closet floor. I also took some things out of the ice box and some change and silver dollars. Actually I had gotten two guns from there, a .357 and the .38 I used to shoot Mr. Williams. The .357 I had already sold.

Under penalty of perjury I hereby swear that the foregoing is true and correct to the best of my information and belief.

Trinity E. Ingle

Dated this _11_ day of February, 2005.

3

A02255

Unit Mgr. Bayless;

   Will you please review these pgs. ($) note that I did get confirmation from my Attorney that Trinity Ingle did write ($) sign that affidavit, Titled, Declaration of Trinity E. Ingle; ($) I have a copy of this in my central file.

   I would like (BOP) (SIS) or appropriate staff to present the Affidavit ($) certify he confirms the text ($) signature; Because for some reason, not disclosed to me; the courts refusing to acknowledge any obligation to release or lower the penalty; for 7.5 yrs now.

   Please confirm my lawyers are my lawyers ($) that this Affidavit is genuine ($) note that I am indigent due to copyright infringement ($) suffering medical ($) psychological injury due to bad dental, dermal, vision care ($) the rape of my wife estrangement et cetera.

Mr. Paul—
   The BOP/SIS is not authorized to authenticate the document. Therefore, the BOP can not state the document is genuine.
      —MBayless, 8/2/13

please respond ($) return papers

Sincerely; Jeffery Paul
(10517042)
417cell/
C Range
7/31/2013 20.